IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


UNITED STATES OF AMERICA,

                    Plaintiff,

vs.                                                    No. 06-40124-01-SAC

ANTONIO ORDUNA-MARTINEZ,

                    Defendant.


MEMORANDUM AND ORDER

          This case comes before the court on defendant's motion to

suppress.  Defendant, the driver of a vehicle stopped on I-70, challenges

the legality of the initial stop of the vehicle, the length of the detention, and

the questioning of defendant.  The government opposes the motion.[1]  An

evidentiary hearing was held on April 17, 2007, at which time the court

heard the testimony of three witnesses, then took the matter under

advisement.  The court has reviewed the evidence submitted by the parties

_____

[1]Defense counsel has also filed a reply brief, but because this was
done without leave of court and counsel made no request for such leave at
the hearing when the court brought the matter to his attention, the reply
brief (Dk. 29) shall be disregarded.

as well as the applicable law, and is ready to rule.

**Facts**

On September 20, 2006, during daytime hours, Kansas Highway Patrol Trooper Chris Nicholas saw a Ford Explorer[2] traveling eastbound on I-70. Trooper Nicholas noticed that the expiration date on the license tag was partially obscured by a tag bracket surrounding the actual license plate.[3] The tag's expiration date was stated on a decal which had been applied to the lower right-hand corner of the tag, and the metal bracket had been cut out so that only part of the date on the registration decal date was showing. Trooper Nicholas' attempt to read the year in which the registration expired was unsuccessful.

Trooper Nicholas followed defendant's vehicle. Although he

---

[2]For purposes of convenience only, the court will at times refer to this vehicle as "defendant's vehicle."

[3]Defense counsel admits that the number "6" was partly obstructed by the bracket. (Dk. 25, p. 2.) The photograph of the tag with bracket, government's Exhibit 1, is "fairly accurate," but not completely accurate in its depiction of the tag at the time Trooper Nicholas saw it. This is because at some point after Trooper Nicholas' initial contact with defendant, the bracket was removed from the license plate and was broken, creating a small gap in the frame. The broken bracket was placed back on the license plate before the photograph was taken. Trooper Nicholas testified that the gap did make some difference in the appearance of the tag, and had pulled the bracket over to its original position and found it covered more of the information on the tag than shown in the photograph.

pulled behind it in the left lane within approximately 50 feet of defendant's vehicle, and tried to read the expiration date on the registration decal on the license tag, he "could not see the two digits for the year."[4] Had the decal been issued in Kansas, Trooper Nicholas could have determined the year of expiration merely from the color of the decal, but since the tag was issued in another state whose color coding he was unfamiliar with, he was unable to do so.

Trooper Nicholas further testified that the State name, "Ohio" was obscured by the bracket.  He confirmed on cross-examination that the state name was partially blocked by the bracket and that he did not know if he could read the name "Ohio" at the time he decided to stop defendant's vehicle.  He stated that at some point he could have guessed defendant's vehicle was from Ohio because he knew that Ohio was the birthplace of flight.[5]

---

[4]The registration decal contained the month and the year of expiration, stating "12-06."  The reasonable inference from the trooper's testimony is that he could read the month, "12", but could not read the year, "06."  Both the month and the year were in the same size of lettering. Accordingly, it is reasonable to infer that the reason the trooper could not read the year was not due to the size of its lettering, but because of the obstruction of the bracket.

[5]The word "Ohio," is written in cursive in a lighter color and smaller size than are the numbers on the tag, and the top of the word "Ohio" is

Trooper Nicholas stopped defendant's vehicle.  While seated in his patrol car behind the vehicle, he still could not read the tag's year of expiration.  He then exited his patrol car and walked up to the rear of the vehicle, examined the license tag by looking "right up next to it," "behind the notch," and was only then able to see the expiration date as "12-06." He then determined that the tag was not expired.

On cross-examination, Trooper Nicholas testified that the sole basis of his stop was that the registration decal was partly covered by the bracket.  He then testified that his purpose in making the stop was to make sure there was no registration violation by virtue of the date.

Trooper Nicholas contacted the driver, asked for and received a drivers license[6] and insurance, and told him he was not getting a ticket.  He explained that he had stopped defendant because his tag covered the end of the expiration year and he could not tell what it said.  Trooper Nicholas then asked some questions about defendant's travel plans including where he was coming from, where he had been, and who the passenger was.

---

partially covered by the tag bracket.  Below the state name are the words, "Birthplace of Aviation," in much smaller print.

[6]Defendant provided a fake license issued to "Saul Nieto," which is an alias.  Testimony did not establish when the trooper realized the license was false.

4

Defendant stated that they had been in California for four or five days visiting a friend in the hospital, and were returning to Ohio. Trooper Nicholas noticed four tires mounted on wheels in the back of the vehicle.  When asked about them, defendant replied that he had purchased them in California, and produced a receipt for them.

Trooper Nicholas invited defendant to the rear of his vehicle where the officer showed him the license plate and said that he "could not read if that was a six or a seven," referring to the "06" on the registration decal.  Thereafter, he reassured defendant he would just get a warning, and asked another question about defendant's travel.

Because noise from the nearby traffic made it difficult to converse, Trooper Nicholas had defendant sit in his patrol car, where he continued asking questions.  Prior to calling dispatch with license information from defendant and his passenger, Trooper Nicholas asked the defendant some questions relating to travel, and some unrelated to travel. These included whether the wheels and tires in the back belonged to defendant, where defendant had bought them, whether the wheels and tires were for the Ford Explorer, what kind of vehicle the wheels fit, how much defendant paid for the wheels and tires, and whether the passenger

5

spoke English.  Trooper Nicholas testified that he was writing the warning ticket while asking all questions.[7]

Trooper Nicholas then asked several more questions about the Explorer before directing defendant to return to the Explorer and to send the passenger back to the patrol vehicle.   After questioning the passenger, he directed him to return to the Explorer, and awaited the return of information from dispatch.  Trooper Nicholas noted a number of factors which raised his suspicions that criminal activity was afoot.[8]

Upon receiving the information from dispatch, Trooper Nicholas approached defendant who was standing at the back of the Explorer, gave him a warning ticket, returned all of defendant's paperwork, and told him, "Have a safe trip."  Both started walking toward their respective vehicles. Trooper Nicholas then asked, "Hey, can I ask you some questions?"  When defendant returned to the back of the Explorer, Trooper Nicholas motioned toward the tires and wheels in the back of the Explorer and asked, "Those

---

[7]He also testified that he started calling defendant's information into dispatch, then asked questions, but the video tape shows that he asked defendant questions in his patrol car for approximately two minutes before calling the occupants' information into dispatch.

[8]These will not be set forth herein, as they are immaterial to the court's analysis.

fit a Honda? Can I look at them?"  The defendant replied, "Yeah," and

opened the back of the Explorer.  The trooper then asked, "You don't have

any drugs, guns, money or stuff like that," and upon receiving a negative

response from defendant, asked for and received consent to search.

During Trooper Nicholas' examination of the tires, wheels and

vehicle, he became convinced that there was a false compartment in the

vehicle and called for backup.  Back-up officers later arrived and the

officers discovered cocaine in the concealed compartment.  Defendant and

the passenger were then arrested and defendant was given a Miranda card

written in Spanish, which he said he understood.  Defendant was not asked

any questions at that time.

Later, Topeka Police Officer Vargas arrived at the scene to

serve as a Spanish interpreter.  At 9:38 a.m., Officer Vargas read

defendant his Miranda rights in Spanish, and defendant replied that he did

not want to talk to him about what happened.   Defendant then stated he

did not know what to do, whether to have an attorney present or not.

Officer Vargas  immediately stopped talking to defendant, believing it was

clear that defendant did not wish to talk with him.

DEA task-force agent Ray Bailiff arrived later, wanting to see if

defendant would cooperate in a controlled delivery to Ohio.  At 12:25 p.m., at Agent Bailiff's request, Officer Vargas again read the Miranda warnings in Spanish to defendant, using the same card as before.  Defendant replied, "I won't talk to you, but I'll answer his questions," nodding at Agent Bailiff during the latter phrase.  In the course of answering Agent Bailiff's questions, defendant made incriminating statements.

**Standing**

The government challenges defendant's standing, contending that he lacks a reasonable expectation of privacy in the car[9] because it is a tool of the drug trade and thus should have no expectation of privacy that society is willing to credit.  The government additionally contends that defendant lacks any lawful possessory interest in the car since it was registered under an "alias," had been purchased by a drug dealer, and had been used for trafficking drugs on more than one occasion.[10]

A defendant who lacks standing to challenge search of the car may nonetheless challenge the initial stop and his subsequent detention.

---

[9]The government makes the same argument as to "the cell phones," but the court does not recall any testimony regarding the seizure of cell phones.

[10]No evidence in support of the latter contentions was offered at the hearing.

*See United States v. Obregon*, 748 F.2d 1371 (10th Cir. 1984). Because defendant makes no challenge to the search of the car, the court finds it unnecessary to reach the government's standing challenge.

**Initial Stop**

Defendant first contends that his initial stop was illegal because the sole basis for the stop was the trooper's inability to see the date on the registration decal, which is not required to be "clearly visible" or "clearly legible" under Kansas law.

A traffic stop is a seizure to which the protections of the Fourth Amendment apply.  *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1257 (10th Cir. 2006).  In deciding the validity of the initial stop, the court looks at whether it was "objectively justified." *United States v. Botero-Ospina*, 71 F .3d 783, 788 (10th Cir.1995) (en banc), *cert. denied*, 518 U.S. 1007 (1996).  To be reasonable under the Fourth Amendment, "a law enforcement officer 'must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping an automobile.' "*United States v. Alvarado*, 430 F.3d 1305, 1308 (10th Cir. 2005) (quoting *United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003)).  The constitutional reasonableness of a traffic stop does not

9

depend on the officer's actual motive in conducting the stop. *Whren v. United States*, 517 U.S. 806, 812-13 (1996). "Thus, 'when evaluating the reasonableness of the initial stop of a vehicle, our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.' " *Alvarado*, 430 F.3d at 1308 (quoting *United States v. Zabalza*, 346 F.3d 1255, 1258 (10th Cir. 2003)).

### K.S.A. § 8-133

Although Trooper Nicholas did not refer to a particular statute during his testimony, his testimony is sufficient to show that he stopped defendant's vehicle because he believed that the bracket's partial covering of the expiration date on the registration sticker constituted an infraction of K.S.A. § 8-133. The parties dispute the applicability of this statute, which states:

> Every license plate shall at all times be securely fastened to the vehicle to which it is assigned so as to prevent the plate from swinging, and at a height not less than 12 inches from the ground ... in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible.

K.S.A. § 8-133.

Defendant argues that a registration decal is not part of a

10

"license plate," within the meaning of that term in the above statute, that there is no requirement that a registration decal be clearly legible or clearly visible, that the purpose for requiring clear legibility/visibility is so that troopers may call the state name and tag number into dispatch, and that officers have no need to see the expiration date stated on the registration decal because they can obtain that date from dispatch upon calling in the state name and tag number. [11]

Defendant's argument is unpersuasive and incorrect.  Kansas law requires that each "license plate shall have displayed on it the registration number assigned to the vehicle and to the owner thereof, the name of the state... and *the year or years for which it is issued.*"  K.S.A. § 8-132(a) (emphasis added).  The legislative history shows that these three items have been required on Kansas license plates from 1929 to the present.  Similarly, the manner in which that information on license plates must be displayed, *i.e.*, clearly visible and clearly legible, has remained constant throughout the years.

Although Kansas license plates used to indicate the year or years for which a plate was issued by a date permanently imprinted on the

_____

[11]The court notes and denies as unnecessary defendant's invitation to certify this question to the Kansas Supreme Court.

plate itself, since 1976 the year of expiration is indicated solely by means of a registration decal affixed to the plate.[12] That the expiration date is stated on a registration decal rather than by letters permanently imprinted on the plate does not mean that the expiration date should no longer be considered a required part of the license plate.  *See also* K.S.A. § 126a (stating that "number plate," "license tags," and similar other terms should be broadly construed.)  The court declines to read K.S.A. § 8-132(a)'s expiration date requirement out of the statute.

The court thus finds that the information required to be displayed on license tags, *i.e.*, "the registration number assigned to the vehicle and to the owner thereof, the name of the state... and the year or years for which it is issued" must be displayed in the manner stated in KSA § 8-133.  Because the registration decal bears the expiration date it is subject to K.S.A. § 8-133's requirement that "every license plate shall at all times be securely fastened to the vehicle to which it is assigned... in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible."  If a registration decal is not in a place and position to be clearly visible or is not maintained

---

[12]K.S.A. § § 8-132(b), 8-134(e).

in a condition to be clearly legible, a violation of this statute occurs.  Here, the date on the registration decal was obscured by the bracket and was thus displayed in an unlawful manner even after the trooper approached the vehicle on foot and was able to peer behind the bracket and read it. *See United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir.2006).

If the date on the registration decal is not required to be clearly legible and clearly visible, as defendant asserts, the date could legally be fully obscured, which would be tantamount to having no date on the license plate at all. This would defeat the purpose of the legislature's requirements that each vehicle's plate indicate its expiration date by means of its registration decal.  Although officers may in fact ascertain the expiration date from their dispatchers, they have no statutory duty to do so.  The statutory duty rests instead with the motorist to display the registration decal in the manner required by the legislature.  In the event the requirement of a an expiration date has become unnecessary or is merely superfluous due to the diligence of law enforcement officers or otherwise, it is up to the legislature, and not this court, to effect a change.

Alternatively, even if the registration decal and expiration date were not subject to the requirements of KSA § 8-133, the traffic stop would

have been legal since Trooper Nicholas noticed that the state name on the

license plate of defendant's vehicle was partially obscured by the bracket.

This constitutes a separate violation of KSA § 8-133. *See United States v.*

*Mesina*, 2003 WL 21497050, *5 (D. Kan. 2003) (finding a violation of *K.S.A.*

*§ 8-133* by license-plate bracket which obscured part of the state name,

regardless of the trooper's knowledge of the state from having recognized

its motto, citing *State of Kansas v. Hayes*, 8 Kan. App. 2d 531, 660 P.2d

1387 (1983)). *See generally Whren*, 517 U.S. at 813. Accordingly,

Trooper Nicholas had reasonable grounds to believe a violation of the

statute had occurred.

**Edgerton**

At the conclusion of the hearing, defense counsel noted

Trooper Nicholas' statement on cross-examination that his purpose for

making the stop was to make sure there was no registration violation - to

make sure of the expiration date on the tag.[13] Counsel submits that this

admission transforms the matter into an *Edgerton* issue.

The court disagrees that the facts in this case trigger an

---

[13]Immediately before this statement, Trooper Nicholas stated that his
only basis for the stop was because the registration decal was partly
covered by the bracket.

analysis under *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006).

*See United States v. Garcia-Medina*, No. 06-40129-SAC (D. Kan. April 30,

2007) (analyzing *Edgerton*'s precedential effect). Were defendant's vehicle

sporting a temporary tag that was "wholly unremarkable" but for conditions

beyond his control such as darkness, the result might be otherwise. *See*

*United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (stating,

"the decision in *Edgerton* rested on the conclusion that § 8-133 does not

criminalize a "wholly unremarkable" temporary registration simply because

a vehicle is traveling at night.) Here, where the required information on the

tag is admittedly partially obscured by a bracket, a "straightforward violation

of § 8-133" has occurred, *Ledesma*, 447 F.3d at 1313, and *Edgerton*

analysis is inappropriate.[14]

**Detention**

        Defendant next contends that he was subject to an

unreasonable detention because the trooper took his license and asked

---

        [14]Nor is *United States v. McSwain*, 29 F.3d 558, 561 (10th Cir.1994),
controlling.  There, although a trooper stopped a vehicle to determine
whether its temporary registration sticker was valid, there was no
requirement that it be visible or unobscured, thus no continuing violation
existed once the trooper determined its validity. *Ledesma*,
447 F.3d at 1313, citing *United States v.* DeGasso, 369 F.3d 1139, 1149
(10th Cir.2004).

him questions for several minutes before calling his information into

dispatch or otherwise furthering the purpose of the stop.  Some of these

questions related to travel plans and some did not.  Defendant does not

dispute that it took approximately four minutes and fourteen seconds from

the trooper's initial stop to the initiation of the computer check, and that had

the trooper begun the computer check immediately upon his receipt of the

driver's license, approximately one minute would have elapsed.  Thus a

three minute and fourteen second delay forms the basis for this challenge.

　　　　　The court has reviewed the video tape, which captures each of

the challenged questions which give rise to the delay.  If one subtracts the

time the trooper spent asking about travel plans, which is clearly within the

scope of a traffic stop, *see United States v. Alcaraz-Arellano*, 441 F.3d

1252, 1259 (10th Cir. 2006) (finding an officer may routinely ask about

travel plans and ownership during a lawful traffic stop),*United States v.*

*Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (holding that an officer may

routinely ask about travel plans and vehicle ownership during a lawful

traffic stop), then the period of delay is closer to one minute than three.

　　　　　It is clear that a "seizure that is justified solely by the interest in

issuing a warning ticket to the driver can become unlawful if it is prolonged

16

beyond the time reasonably required to complete that mission."  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  But "[a] traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) (quoting *United States v. Martin*, 422 F.3d 597, 601-02 (7th Cir. 2005)). Questioning during a search does not violate the Fourth Amendment if it does not extend the stop " 'beyond the time reasonably required to complete [the stop's original purpose].' " *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405 (2005)).   Thus "[a]s long as the [deputy's] questioning did not extend the length of the detention, ... there is no Fourth Amendment issue with respect to the content of the questions."  *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005)*; see United States v. Stewart*,  473 F.3d 1265, 1269 (10th Cir. 2007) (holding the correct Fourth Amendment inquiry assuming the detention is legitimate is whether the questions extended the time that a driver was detained, regardless of the questions' content.)


This court's examination is clear.

17

> ... we need not make a time and motion study of traffic stops; we
> consider the detention as a whole and the touchstone of our inquiry is
> reasonableness.
> ...we must consider the individual circumstances that confronted the
> troopers, using "common sense and ordinary human experience" to
> determine whether "the police acted less than diligently, or ...
> unnecessarily prolonged [the] detention." *United States v. Sharpe*,
> 470 U.S. 675, 685, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985).

*United States v. Patterson*, 472 F.3d 767, 776 (10th Cir. 2006).

Here, Trooper Nicholas testified that he was writing the warning ticket during the time he asked the questions in his patrol car. The questions unrelated to the traffic stop were asked only in the patrol car. Thus defendant has failed to show that any delay whatsoever is attributable to such questions.  Even had the trooper not been writing the warning ticket during the entire time such questions were asked, the one or two minute delay in the present case caused by the trooper's questions unrelated to the traffic stop did not appreciably lengthen defendant's detention beyond completion of the traffic stop.  *See United states v. Cano*, 2006 WL 2620041, *7 (D. Kan. 2006) (finding 90 second delay before asking dispatcher to check license status and criminal history reasonable). The total time for the stop from the initial contact  to defendant's receipt of his documents and the warning was approximately eleven minutes, which is not unreasonable under the circumstances of this case.  See *United States*

18

*v. Garner*, 2007 WL 949746, *3 (10th Cir. 2007); *United States v. Yeomans*, 2007 WL 30032, *5 (10th Cir. 2007); *United States v. Flores-Ocampo*, 173 Fed. Appx. 688, 695, 2006 WL 856220 (10th Cir. 2006); *United States v. Jeter*, 175 Fed. Appx. 261, 264, 2006 WL 1266523 (10th Cir. 2006).

**Statements made by defendant**

      Defendant next contends that statements he made to the investigators should be suppressed since they were in violation of his rights to counsel and to remain silent.

      **Right to counsel**

      Defendant contends that he requested a lawyer, but admits that his requests for a lawyer may have been equivocal.  (Dk. 25, p. 22)  Under the law, a suspect "must unambiguously request counsel" in a manner that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  *Davis v. United States*, 512 U.S. 452 (1994).

      The testimony at the hearing established that after Officer Vargas Mirandized defendant at 9:38 a.m., defendant responded by saying that he did not want to talk about what happened, and he did not know

what to do - whether to have an attorney present or not.  Officer Vargas immediately ceased speaking to defendant.  The court finds that defendant's latter statement was not an unambiguous request for counsel, if a request at all.  Accordingly, defendant's Sixth Amendment rights were neither invoked nor violated.

### Right to remain silent

Defendant additionally alleges that his desire to remain silent was not scrupulously honored. Defendant focuses upon the fact that he was Mirandized three times within five hours, and clearly invoked his right to remain silent before the last interrogation in which he made incriminating statements.  Defendant does not contend that any officer harassed or pressured him in any way to revoke his assertion of the right to remain silent.  The court agrees that the testimony establishes that defendant clearly invoked his Fifth Amendment right to remain silent when he was Mirandized at 9:38 a.m. by Officer Vargas, and that defendant was again Mirandized by Officer Vargas at approximately 12:25 p.m. at the request of Agent Bailiff, who then interrogated defendant and obtained incriminating information from him.

"The Fifth Amendment requires the government to cease

questioning a suspect if he invokes his right to remain silent and permits

the government to reopen questioning only if the suspect consents.

*Michigan v. Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313

(1975); *United States v. Glover*, 104 F.3d 1570, 1581 (10th Cir. 1997)."

*United States v. Alexander*, 447 F.3d 1290, 1293 (10th Cir. 2006). If a

suspect invokes this right, then the admissibility of any further statements

by the suspect depends "on whether his right to cut off questioning was

scrupulously honored." *Mosley*, 423 U.S. at 104 (quotation marks omitted).

Defendant argues the government violated this fundamental principle by

improperly reinitiating questioning through Agent Bailiff.

The government contends that defendant's request to remain

silent was equivocal because immediately after saying he did not want to

talk about what happened, defendant volunteered a statement to Officer

Vargas. The Tenth Circuit has noted:

> A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.  If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation."

*United States v.Sanchez*, 866 F.Supp. 1542, 1559 (10th Cir.1994).

Here, the sole statements made by defendant to Officer Vargas were that he did not want to talk about what happened, and he did not know what to do - whether to have an attorney present or not. Officer Vargas immediately stopped talking with defendant because it was "clear" to him that defendant did not want to talk about the incident.  The language used by defendant relating to his right to remain silent is neither ambiguous nor equivocal.  Given the separate nature of  the right to counsel and the right to remain silent, the court declines to find that defendant's statement about his right to counsel worked an equivocation of his otherwise clear and unambiguous invocation of his right to remain silent.

The government focuses upon defendant's same statement in its alternative assertion that defendant voluntarily reinitiated conversation with officers by asking Officer Vargas for advice about a lawyer.  *See United States v. Glover*, 104 F.3d 1570, 1581 (10th Cir.1997) (permitting police to take statement of defendant who invoked right to counsel but then re-initiated discussion and volunteered statements.); *United States v. Alexander*, 447 F.3d 1290, 1294 (10th Cir. 2006).

The court does not believe that this exception stretches so far as to encompass the present facts.  Officer Vargas did not believe that

22

defendant's statement about counsel constituted an re-initiation of conversation by defendant. Instead, upon hearing defendant's statement, he immediately terminated the conversation because it was clear to him that defendant had not invoked his right to remain silent in one breath, then revoked it with his next.  A reasonable officer in his shoes would have done the same.  Additionally, the statements which defendant seeks to suppress were made pursuant to a subsequent interrogation admittedly initiated by Agent Bailiff, and are not defendant's statement about counsel.

Nonetheless, the court does not find a Fifth Amendment violation under the present facts. Defendant contends that once an individual expresses his desire to remain silent, all interrogation must cease and police may reinitiate questioning only if all four of the following conditions are met:

> (1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) a substantial interval passed before the second interrogation; (3) the defendant was given a fresh set of Miranda warnings; and (4) the subject of the second interrogation [is] unrelated to the first.

*Mosley*, 423 U.S. at 104-05 (1975).  Defendant takes no issue with the first three factors, but contends that because the subject of the second interrogation by Agent Bailiff was related to the first one attempted by

23

Officer Vargas, the test is not met and defendant's statements must be deemed involuntary.

This court does not believe that the Tenth Circuit would read *Mosley* so narrowly as to require that all four elements be met in every case. Although the Tenth Circuit has recently stated that police may reinitiate questioning, "but only if" the four conditions from *Michigan v. Mosley* are met , *Alexander*, 447 F.3d at 1294, the sole issue before the court in *Alexander* was whether a private individual's conduct constituted government action. The loose pronouncement about the necessity of all four elements in the four-part test was thus dicta.

The Tenth Circuit has not applied the four-part test, when squarely confronted with the issue. In *Littlejohn v. Nelson,*1992 WL 372593, *2 (10th Cir. 1992), the issue was:

> whether Mr. LittleJohn's due process rights were violated by the police-initiated second interrogation when he had invoked his right to remain silent the previous day. The applicable test is whether the police scrupulously honored the suspect's right to cut off questioning. *Michigan v. Mosley*, 423 U.S. 96, 106 (1975). Other circuits have noted that whether the police satisfied this test requires a case-by-case analysis, but at a minimum the police must refrain from further questioning the suspect for a significant period of time. (Citations omitted.)

 *Littlejohn,* 1992 WL 372593 at 2.

The court resolved the issue without examining whether the subject of the second interrogation was related to the first, finding:

> ... that the police officers scrupulously honored Mr. LittleJohn's right to remain silent because they immediately terminated the initial interrogation upon his request and because the second interrogation did not occur until the following morning, after Mr. LittleJohn was given fresh Miranda warnings and signed a waiver.

*Littlejohn,* 1992 WL 372593 at *2.

Similarly, the Tenth Circuit rejected a bright-line *Mosley* test in *Robinson v. Attorney General of State of Kansas*, 28 Fed. Appx. 849, 853, 2001 WL 1515841, *3 (10th Cir. 2001) (finding Robinson not entitled to habeas relief on claim that a confession was obtained in violation of his right to remain silent), stating:

> Robinson's suggestion that the *Mosley* facts amount to "a bright-line test to determine whether a suspect's right to cut off questioning was 'scrupulously honored' " has been rejected by other federal circuit courts of appeal. *Weeks v. Angelone*, 176 F.3d 249, 268 (4th Cir. 1999). Like the Kansas Supreme Court, these courts have concluded that "the touchstone is whether a 'review of the circumstances' leading up to the suspect's confession reveals that his 'right to cut off questioning was fully respected.' " *Id.* (citing *Mosley*, 423 U.S. at 104, 96 S. Ct. 321); *see also United States v. Schwensow*, 151 F. 3d 650, 659 (7th Cir.1998).

*Robinson*, 28 Fed.Appx. at 853.

The Tenth Circuit then approved the Kansas Supreme Court's holding in these words:

> Based on *Miranda* and *Mosley*, if a defendant invokes his or her right to remain silent, the interrogation must stop immediately and the right must be scrupulously honored. This does not mean an interrogation resumed at a later time is invalidated if the defendant knowingly and voluntarily waived the right to be silent at this later time and the defendant's right to be silent was scrupulously honored while it was invoked. *Id.* at 54.

*Robinson*, 28 Fed. Appx. at 853.  The Tenth Circuit concluded that "... the Kansas Supreme Court's decision upholding the trial court's admission of Robinson's videotaped confession was not based on an unreasonable application or interpretation of *Mosley*." 28 Fed. Appx. at 853, 2001 WL 1515841 at *4.

Additionally, the Tenth Circuit noted in 2004 that whether police may return to the original subject of interrogation was an "open question," stating:

> We recognize that other courts of appeals have concluded that there is no definite time police must forego questioning and that police may return to the original subject of interrogation.  *See, e.g., United States v. Hsu*, 852 F.2d 407, 410-11 (9th Cir.1988).  We decline to take up these questions because we conclude that the most essential requirement, the cessation of interrogation, did not occur in this case.

*United States v. Rambo*, 365 F.3d 906, 911 (10th Cir. 2004).

This court believes that the Tenth Circuit, if faced with the issue, would adopt the flexible approach demonstrated in *Hsu*, which takes account of all relevant circumstances.

26

Far from laying down inflexible constraints on police questioning and individual choice, *Mosley* envisioned an inquiry into all of the relevant facts to determine whether the suspect's rights have been respected.  Among the factors to which the Court looked in that case were the amount of time that elapsed between interrogations, the provision of fresh warnings, the scope of the second interrogation, and the zealousness of officers in pursuing questioning after the suspect has asserted the right to silence. *See Mosley*, 423 U.S. at 104-06, 96 S. Ct. at 326-27.  At no time, however, did the Court suggest that these factors were exhaustive, nor did it imply that a finding as to one of the enumerated factors-such as, for example, a finding that only a short period of time had elapsed-would forestall the more general inquiry into whether, in view of all relevant circumstances, the police "scrupulously honored" the right to cut off questioning.

*United States v. Hsu*, 852 F.2d 407, 410 (9th  Cir.1988).

Here, it is undisputed that at the time the defendant invoked his right to remain silent with Officer Vargas at 9:38 a.m., the questioning ceased.  Approximately two hours and forty-seven minutes passed, which the court finds to be a substantial interval, before the second interrogation. At that time defendant was given a fresh set of Miranda warnings.  Even assuming that Officer Vargas intended to ask defendant about the drugs in the vehicle and the subject of Agent Bailiff's interrogation was related to that same subject, Agent Bailiff had a different goal in speaking with defendant than did Officer Vargas - to see whether defendant would agree to cooperate in a controlled delivery to Ohio.  Once this was explained to

27

defendant, it created an incentive for defendant to speak with Agent Bailiff, although he had refused to do so with Officer Vargas.

Testimony established that no threats, promises, use of force, or improper inducement for defendant to talk were used.  Defendant's right to cut off questioning was 'scrupulously honored' while it was invoked. Defendant understood his Miranda rights and made a knowing and voluntary waiver of his right to be silent by choosing to speak to Agent Bailiff.  "This is not a case ... where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind."  *Mosley*, 423 U.S. at 105-06.  Accordingly, the court finds no violation of defendant's Fifth Amendment right to remain silent.

IT IS THEREFORE ORDERED that defendant's motion to suppress (Dk. 25) is denied.

Dated this 2nd day of May, 2007, Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge